UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

United States of America

                v.

Miguel Manso,

                      Defendant.

**Report and Recommendation**

13-CR-83S

---

I.      INTRODUCTION

On March 7, 2013, law enforcement officers visited the house of defendant Miguel Manso ("Manso") to talk to him about an ongoing drug investigation that later prompted this case. The officers were in plain clothes. Manso let the officers into his house and spoke to them for about half an hour. The officers did not administer *Miranda* warnings. At the end, the officers left without arresting Manso.

On July 5, 2016, Manso filed a motion (Dkt. No. 378) to suppress any statements that he made during the March 7, 2013 interview. Although he has characterized the officers as "very respectful, very educated" during the interview, he also claims that the officers warned him that he could face 20 years in prison if he did not cooperate and that he would not see his family and children. Combining that threat with Manso's knowledge that the officers were armed, Manso argues that the interview was tantamount to a custodial interrogation that required *Miranda* warnings. The Government opposes suppression on the grounds that Manso chose to let the officers into his house, was told that he could end the interview at any time, and proceeded with a consensual conversation.

The Court held a suppression hearing on August 25, 2016, and the parties have duly filed post-hearing briefing. For the reasons below, the Court respectfully recommends denying Manso's motion.

II.   BACKGROUND

The background of the overall case appears extensively in the docket, and the Court will not repeat it here. For the sake of brevity, the Court will focus on the facts most pertinent to Manso's motion, as developed at the suppression hearing.

On March 7, 2013, Detective John Garcia ("Garcia") of the Buffalo Police Department visited Manso at his house on 18 10th Street in the City of Buffalo. Federal Bureau of Investigation ("FBI") agents Thomas Palmer ("Palmer") and Jason Galle ("Galle"), and Erie County Sheriff's Deputy / Safe Streets Task Force member Adam Imiolo ("Imiolo"), accompanied Garcia. The officers wanted to interview Manso as part of an ongoing investigation of Oneil Quinones, a co-defendant in this case. At the time, no warrants or accusatory instruments issued against Manso. Garcia carried his weapon with him, but it was not visible, and none of the officers were wearing police uniforms or any visible sign that they were law enforcement officers. (Dkt. No. 411 at 12, hereinafter denoted as [12].) The officers also had approached Manso's house in unmarked vehicles. [34–35.] The officers asked Manso if they could come in and speak with him. Manso did let them in and was "cooperative" and "a gentleman." [14, 86.] The officers and Manso sat around a table in a room that might have been a dining room, while members of Manso's family went toward the back of the house. [13.] Galle was the lead interviewer. [13, 15.] Garcia acted as interpreter; he was born in Spain and has used the Spanish language fairly regularly all his life.

[6–7.] As the interview unfolded, Galle would make statements or ask questions in English; Garcia would translate for Manso; Manso would answer in Spanish; and Garcia would translate the answers back to Galle. [15.] Garcia acknowledged that his Spanish differed from the Spanish spoken in Puerto Rico and other places, but he mentioned at the suppression hearing that he has developed ways to address linguistic differences during an interview. [28–29.] Galle took notes during the interview and eventually prepared the FD-302 form that was Government Exhibit 1 at the suppression hearing.

According to Garcia, who testified at the suppression hearing, the interview unfolded as a conversation. Galle, through Garcia, gave Manso an initial advisement. [15.] Galle's introduction was not an advisement of *Miranda* rights, and the Government has stipulated that *Miranda* warnings were not administered. [24, 41.] Galle then proceeded with questions that Manso did not hesitate to answer. [17.] Manso did not refuse to answer any questions and never directed the officers to leave his house. [19.] Garcia did not remember many details about specific questions asked or specific statements made during the interview [25, 27, 31] but did remember that no officers made any statements about Manso going to jail for any particular period of time. [19.] According to the FBI's FD-302 form, Manso made statements to the effect that he sold heroin for co-defendant Jorge Quinones for about two weeks in February 2013. Manso allegedly admitted to selling heroin to individuals outside of 24 10th Street. Garcia estimated that the interview lasted about half an hour. [16–17.] At no time did the officers display a weapon, handcuff or restrain Manso, or threaten him. [17.] The officers did not arrest Manso at the end of the interview or have any physical contact with him. [18.]

Manso himself testified at the suppression hearing, and his account of the events of March 7, 2013 differed in a number of ways. According to Manso, he was not home when he received a telephone call from his family that police had arrived at his house; he hurried home to see them. [39.] When Manso greeted the officers, one stayed outside while the other three entered the house. [40.] Manso asked whether his wife could stay with him during the interview, and the officers said no. [40.] Manso recalled the interview occurring in the living room, which had a sofa in it. [40.] Manso claimed to have trouble understanding Garcia; Manso's and Garcia's Spanish dialects were sufficiently different that Manso considered Garcia's dialect to be "weird Spanish." [42.] Manso denied having anything to do with Jorge Quinones. [43, 45.] At some point in the interview, according to Manso, the officers started threatening him in several ways. The officers allegedly told Manso that he could face 20 years in prison if he did not cooperate and that he would not see his family and children. [44.] Once the officers threatened Manso with 20 years in prison, he "stopped answering questions." [56.] "I told them if they wanted to arrest me, that I was moving, but that they could arrest me if they had anything to arrest me [sic]. And then they said they could not arrest me because they had no evidence against me." [57.] Manso testified that one of the officers then opened his jacket to show his badge, and Manso could see the officer's gun. [58.] No officers ever drew their weapons, however. [60.] Manso considered the officers respectful. [60.] When one of the officers allegedly confronted Manso with direct evidence of drug transactions, he responded, "[W]ell, take me to the station and show me the evidence where I am putting the bag in the car." [66.] Additionally, the officers never told Manso that he could not leave Western New York for Massachusetts, though the topic appears not to have come up during

the interview. [50.]¹  Manso wants all of the statements in the FD-302 form suppressed for several reasons.  Manso argues that he "was placed in a situation by the officers where no reasonable person would believe they had the right to leave and not converse with the officer." (Dkt. No. 378-1 at 2.)  That situation included threats and increasing hostility.  (*Id.*)  Compared to Garcia, who did not remember a lot of details of the interview, Manso asserts that he recalls the intimidation, the police cars parked in front of his house, the "officers who were intent on questioning him," and his own knowledge that the officers would have been armed.  (Dkt. No. 414 at 2.)  Manso concludes that his interview amounted to a custodial interrogation that would have required *Miranda* warnings.  The Government disputes that the interview resembled a custodial interrogation.  The Government emphasizes that the officers went to Manso's house with no visible indicia of law enforcement authority.  (Dkt. No. 413 at 2.)  The Government also highlights that the interview occurred in Manso's own house, with family not too far away, and that the officers told Manso that "he was not under arrest, he did not have to answer any questions, and he could end the questioning at any time." (Dkt. No. 383 at 3.)  The Government also questions Manso's credibility, given that he had just been released from jail on a prior conviction involving drugs; that he invited the officers into his house; that the officers never drew weapons; and that the officers were respectful and polite throughout the interview.  (Dkt. No. 413 at 5.)

---

¹ At the suppression hearing, the Government interpreted Manso's testimony—that he was never told not to leave—to be referring to the interview. [51.]  In context, though, Manso more likely was referring to his move to Massachusetts, an issue that has arisen at other times in the case.  [57, 61]; *see also, e.g.*, Dkt. Nos. 234, 235.

5

### III.  DISCUSSION

The basic *Miranda* principles are well known.  "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.  If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.  The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."  *Id.* at 445.  The Supreme Court has explained that a *Miranda* analysis occurs in two stages:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  The first inquiry, all agree, is distinctly factual . . . .  The second inquiry, however, calls for application of the controlling legal standard to the historical facts.  This ultimate determination, we hold, presents a mixed question of law and fact qualifying for independent review.

*Thompson v. Keohane*, 516 U.S. 99, 112–13 (1995) (internal quotation and editorial marks and citations omitted).

"Statements elicited in noncompliance with [*Miranda*] may not be admitted for certain purposes in a criminal trial.  An officer's obligation to administer *Miranda* warnings attaches, however, only where there has been such a restriction on a person's freedom as to

render him in custody. In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation and editorial marks and citations omitted); *see also Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). "[A] police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Id.* at 324 (citation omitted). Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Id.* at 325 (internal quotation marks and citations omitted).

In addition to the requirement of custody, the need for *Miranda* warnings also requires that interaction between a person and law enforcement officials qualify as an "interrogation." "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition

focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Imagining oneself in 'the suspect's position' necessarily involves considering the circumstances surrounding the encounter with authorities. Those circumstances include, *inter alia*, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion . . . ." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (citations omitted).

      Here, the Court does not see any factors that would have pushed the interview across the threshold of a custodial interrogation. Manso has conceded that he invited the officers into his house and that the officers were respectful at all times. *Cf. Beckwith v. United States*, 425 U.S. 341, 347 (1976) (affirming the defendant's conviction and the denial of his motion to suppress statements from an interview at a private residence); *accord United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (citations omitted) ("It is similarly clear that Brouillette was not in custody during his interview. The entire interview occurred in the familiar surroundings of Brouillette's home."). Although Manso did testify

that he felt obligated to "drop everything" [39] and to hurry home to greet the officers, he did not testify that he felt compelled to let the officers into his house. Whether the interview occurred around a dining room table or in a living room at a table and a sofa, the parties seem to agree that the interview proceeded with no show of authority and no physical restraint. Cf. *United States v. Simmonds*, 641 F. App'x 99, 103 (2d Cir. 2016) (citations omitted) ("In contrast to cases finding custody because of a 'police-dominated atmosphere,' Agent Destito was dressed in plain clothes, his weapon was holstered and concealed by his jacket, he was not positioned between Simmonds and the apartment's exit, no other officers were involved in the interview, and the tone of the interview was conversational in nature."); *Mitchell*, 966 F.2d at 98–99 ("Mitchell welcomed the EPA representatives into his home and was cooperative. He willingly divulged information. Although the interview grew 'heated' at times, [the agent] engaged in no speech or actions which reasonably could be taken as intimidating, coercive, or restricting Mitchell's freedom of action."). The interview lasted only about half an hour. The Government concedes that Manso's family went toward the back of the house when the officers arrived (Dkt. No. 413 at 3), which implies either a direction by the officers, or at least an understanding by the family, under the circumstances, that they could not stay and witness the interview. Either way, the parties seem to agree that the family left the interview room without any show of force. The Court finds credible that the officers would have provided Manso with an initial advisement that he was not under arrest and that he could terminate questioning in any time. Manso's testimony hints at the delivery of such an advisement; his allegation that

the officers "said they could not arrest me because they had no evidence against me" [57] would be consistent with the advisement, accounting for an alteration of the words through Garcia's translation and Manso's understanding of it. Manso's allegation about the threat of incarceration and of not seeing his family again could, under the right circumstances, be more problematic. The Court, however, gives little weight to that allegation. Manso testified that he panicked when hearing the threat of 20 years in prison [49]; if he felt pressure to talk then the pressure could be the reason for the amount of detail that appears in the FD-302 form. Manso also testified, however, that upon hearing the threat, he "stopped answering questions" [56] and challenged the officers to arrest him or to show their evidence [58, 66]. If Manso decided to stop answering questions then his testimony implies that he did answer questions before the alleged threat. Additionally, the alleged threat "that I wouldn't be able to see my family" [65] would appear to be inconsistent with the observation that the officers were being "very respectful, very educated." [60.] The more likely reason for the details in the FD-302 form is that Manso felt comfortable talking to the officers in his house. A reasonable person would have felt the same way.

After viewing all of the circumstances surrounding the March 7, 2013 interview, the Court concludes that the interview did not satisfy either of the two elements of a custodial interrogation. The Government thus has met its burden of demonstrating that the statements in the FD-302 are not subject to suppression. *See United States v. Martinez*, 992 F. Supp. 2d 322, 332 (S.D.N.Y. 2014) (citation omitted) ("On a motion to suppress,

the government bears the burden of proving the propriety of law enforcement conduct by a preponderance of the evidence.").

## IV. CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends denying Manso's motion. (Dkt. No. 378.)

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

/s Hugh B. Scott
Honorable Hugh B. Scott
United States Magistrate Judge

DATED: September 21, 2016